# United States Court of Appeals
## For the First Circuit

No. 07-1074

UNITED STATES OF AMERICA,

Appellant,

v.

MICHAEL K.C. TOM,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Lynch and Lipez, Circuit Judges,
and Barbadoro,* District Judge.

Jonathan F. Mitchell, Assistant United States Attorney,
with whom Michael J. Sullivan, United States Attorney, and Cynthia
A. Young, Assistant United States Attorney, were on brief, for
appellant.
Mark W. Pearlstein, with whom Benjamin A. Goldberger and
McDermott Will & Emery LLP, were on brief, for appellee.

October 1, 2007

\* Of the District of New Hampshire, sitting by designation.

**LYNCH**, **Circuit Judge**. The government appeals as unreasonably lenient a sentence of thirty-six months' probation (including six months of community confinement) imposed on a white-collar criminal, Michael Tom. Tom, a securities professional, illegally made almost $800,000 in insider trading profits and then obstructed justice by lying under oath to the Securities and Exchange Commission, encouraging another witness to lie, and creating a false document.

The low end of the Sentencing Guidelines range for Tom, including a two-level increase for obstruction of justice, was thirty-seven months' imprisonment, and the prosecution agreed to make that recommendation as part of a plea agreement. After accepting Tom's guilty plea, the court declined to sentence within the Guidelines range or to imprison Tom, and stated three reasons for its sentence. The court primarily rested on a disparity rationale: that Shengnan Wang, who as a cooperating co-defendant received a U.S.S.G. § 5K1.1 departure, was the insider tipper and gained $9,761, and had been sentenced by a different judge to twelve months' probation (and 500 hours community service). The court stated that Tom was less culpable than Wang, and that made any Guidelines sentence for Tom unjust. The court also articulated a concern that Tom was subject to sanctions by the SEC, and a prison sentence would over-punish him. Finally, while the court had concluded that family circumstances would not justify a

downward departure, the court noted that Tom's family problem -- a daughter's illness -- factored into the mix.

We agree with the government that the sentence is unreasonable and that it did not give adequate consideration to the seriousness of the offense, the need for general deterrence for white-collar crimes, and the need for some imprisonment. We reverse and remand for resentencing.

## I.

On February 15, 2006, Michael Tom waived indictment and pleaded guilty to five counts of insider trading in violation of 15 U.S.C. § 78j(b) and § 78ff(a). The insider trading arose out of a call on April 29, 2004 that Tom received from Shengnan Wang, an employee of Citizens Bank. Tom and Wang had worked together at Citizens during the end of 2003, where he had helped hire and train her, and they kept in touch when Tom left Citizens to start a hedge fund, Global Time Capital Management. In February 2004, Wang and her husband invested $60,000 in Tom's fund.

Wang's department performed due diligence on banks which Citizens sought to acquire. The day before Wang called Tom, her supervisor informed her that other members of her department were traveling to conduct due diligence at an acquisition target; while she deliberately was not provided the destination, she learned through her own investigations that the due diligence was taking

place in Cleveland, Ohio, and that three banks were based there: KeyCorp, National City Corporation, and Charter One.

In Wang's call to Tom the next morning, she told him that the Citizens team was analyzing an acquisition target in Cleveland, Ohio. Ten minutes after the call, Tom sent an e-mail to his brother recommending that he purchase securities in the three banks. In the next two-and-a-half hours, Tom made eighteen purchases of over $25,000 of stocks and options in each of the three likely target banks for the hedge fund, for himself, and for family members whose accounts he controlled. Over the next several days, as sales volume in Charter One increased, Tom sold off his securities in the other two banks and acquired a larger position in Charter One. By the end of the week, he had made 52 trades, acquiring 952 Charter One call options and 2,100 shares of Charter One common stock. Neither Wang nor her husband purchased any securities.

After the market closed on May 4, 2004, Citizens announced it was acquiring Charter One. The next day, Tom sold virtually all of his Charter One holdings and realized a gain of $743,505.37. Including his brother's gain of $39,089, the total gain reasonably attributable to Tom was $782,594.37.

After an article the following week on the Forbes website mentioned Tom's unusual trading activity, the SEC initiated an investigation. Tom attempted to obstruct this investigation in

-4-

numerous ways.  First, he told Wang's husband to sign a new backdated investment contract in an attempt to mislead the government as to any link between Wang and Tom.  This backdated document was provided to the SEC pursuant to a subpoena.  Second, Tom convinced Wang to cover up the real purpose of her phone call, telling her to tell the SEC that she had called not to give information about the merger, but to seek his guidance in using one of Citizens' financial databases.   Lastly, Tom provided false testimony under oath to the SEC, giving information that was directly contrary to the available evidence regarding his communications with Wang.

Wang and her husband were charged with insider trading separately from Tom.  They both pleaded guilty before a different district court judge.  Because Wang cooperated in the case against Tom, she received a U.S.S.G. § 5K1.1 departure for providing substantial assistance to the government.  The judge sentenced them both to one year of probation.[1]

Tom signed a plea agreement with the government in which both parties agreed that the proper Guidelines range was thirty-seven to forty-six months in prison, which included a two-level increase for obstruction of justice.  He waived his right to appeal the sentence or seek any departure, except on two grounds:  (1)

---

[1]     The record does not indicate the government's recommended sentence for Wang and her husband.

because of his extraordinary family circumstances and (2) because the loss overstated the seriousness of his offense.

The government took the position that thirty-seven months' imprisonment, the low end of the Guidelines, was warranted. Tom sought a departure from the Guidelines range on both his reserved grounds, requesting thirty-six months' probation, including twelve months' home detention. Based on a report from a holistic medical practitioner who diagnosed his daughter as suffering from heavy metal poisoning, Tom argued that he was her necessary caregiver. He then claimed that the loss was overstated because at a certain point after he began trading Charter One securities, he relied on publicly available information. In addition to the grounds for departure, Tom also argued to the court that he had already agreed with the SEC never to work in the investment industry again, and that he still was potentially liable to the SEC in an outstanding civil action. Lastly, Tom mentioned the need to avoid a sentencing disparity between him and Wang, arguing that as the insider, she was the more culpable of the wrongdoers.

The district court appropriately calculated the Guidelines range of thirty-seven to forty-six months in accord with the plea agreement and declined to grant Tom's request for a departure under the Guidelines. The government provided a report from a board-certified toxicologist stating that Tom's daughter

likely did not suffer from metal poisoning, and that the treatment Tom suggested could in fact put her at greater risk. The report went on to say that even if the daughter did require that treatment, Tom's participation was unnecessary. The court then concluded that Tom's presence was not "essential" to his daughter, and that his family circumstances did not rise to the level that would result in a departure. In addition, the court decided that it was impossible to disentangle Tom's insider trading from his trading based on public information.

In rendering Tom's sentence, however, the court imposed a term of thirty-six months' probation, six of which were to be served in a community confinement center. The court based the sentence on three reasons. First, it said it wanted to avoid sentencing disparity between Tom and Wang, whom the court viewed as more culpable. While the court recognized that it had no basis from the record to assess the reasons for Wang's sentence, and that Wang had cooperated while Tom had not, it stated that "it doesn't seem altogether fitting and proper that the person who is at the center of this criminal conduct should get a year's probation while Mr. Tom faces three years of incarceration. That disparity alone suggests to me that a Guideline[s] sentence is not the appropriate sentence." Second, the court recognized that Tom was still subject to punishment by the SEC. Third, the court recognized that while Tom's "family problem" did not qualify for a departure, his

presence at home was "important to the development of his daughter."  The government appealed the sentence as unreasonably lenient.

## II.

This court is required on appeal to review sentences for reasonableness.  United States v. Booker, 543 U.S. 220, 261 (2005); United States v. Jiménez-Beltre, 440 F.3d 514, 517 (1st Cir. 2006) (en banc), cert. denied, 127 S. Ct. 928 (2007).  The sentence at issue is substantially below the Guidelines scale of a minimum of thirty-seven months' imprisonment, and imposes no imprisonment. "[T]he farther the judge's sentence departs from the guidelines sentence the more compelling the justification . . . the judge must offer."  United States v. Thurston (Thurston III), 456 F.3d 211, 215 (1st Cir. 2006) (quoting United States v. Smith, 445 F.3d 1, 4 (1st Cir. 2006)).  We look for both "a plausible explanation and a defensible overall result."  Jiménez-Beltre, 440 F.3d at 519.  This is not a case of inadequate explanation of the court's reasons for the sentence, but of whether the reasons stated do come to a defensible overall result.[2]  The sentence essentially substituted for a term of over three years' imprisonment a term of probation. Further, the only confinement imposed was community confinement, and then only for a six-month period.

---

[2]    We do not address the hypothetical question of whether any deviation was unreasonable, but only of whether this sentence was unreasonable.

The low sentence was primarily based on a comparison with a co-defendant, and cannot be justified on that basis. Our circuit law firmly holds that the concern with disparity among defendants is primarily a national concern, and not a concern about defendants in a particular case or court. Thurston III, 456 F.3d at 216; United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006).

Post Booker, there remains a strong interest in national uniformity among defendants who commit the same crimes and are similarly situated. We have not held that consideration of co-defendant disparity before the same judge is impermissible, but have often rejected arguments relying on co-defendant disparity as a basis to give lenient sentences well below the Guidelines range. See Thurston III, 456 F.3d at 215 (vacating a sentence that relied on co-defendant disparity); United States v. Navedo-Concepción, 450 F.3d 54, 60 (1st Cir. 2006) (concluding that district court was reasonable in sentencing a defendant to a longer sentence than co-defendants); United States v. Saez, 444 F.3d 15, 18 (1st Cir. 2006) (same), cert. denied, 127 S. Ct. 224 (2006); United States v. Gomez-Pabon, 911 F.2d 847, 862 (1st Cir. 1990). We have done so because, inter alia, a focus on co-defendant disparity has a tendency to thwart the goal of national uniformity. See, e.g., Thurston III, 456 F.3d at 215.

The Sentencing Guidelines and decisions by the Sentencing Commission, while not exclusive, are the vehicles for "promoting

[national] uniformity and fairness." Jiménez-Beltre, 440 F.3d at 518. This is in part because the Guidelines (a) represent the only integration of the multiple statutory factors set forth in 18 U.S.C. § 3553(a); (b) are a reflection of data on past sentencing practices; and (c) bear the imprimatur of the Sentencing Commission, which is the expert agency charged with developing the Guidelines. Id.; see also Rita v. United States, 127 S.Ct. 2456, 2463-65 (2007); United States v. D'Amico, ___ F.3d ___, 2007 WL 2253494, at *8 (1st Cir. Aug. 7, 2007); Smith, 445 F.3d at 4.

Here, it is true, as the defendant argues, that there is no statute requiring a mandatory minimum sentence for this crime. It would be wrong to conclude, as Tom claims, that congressional intent is not at issue in substantial deviations because the Guidelines are not a statute. In Thurston III, we recognized that the Commission, in revising the Guidelines, was responding to congressional concern over the leniency of punishments for white-collar offenses. 456 F.3d at 218. We have also recognized that the statute, 18 U.S.C. § 3553(a), expressly refers to "the need to avoid unwarranted sentence disparities" across the nation. Smith, 445 F.3d at 3-4 (quoting 18 U.S.C. § 3553(a)(6)) (internal quotation mark omitted). Further, the Supreme Court in Rita has reaffirmed that the Guidelines largely reflect what Congress intended. See Rita, 127 S. Ct. at 2463-65 (2007) (noting that "the

-10-

Guidelines, insofar as practicable, reflect . . . sentences that might achieve § 3553(a)'s objectives").

Thus, under circuit law, while consideration of disparity among sentences imposed by the same judge on similarly situated defendants may play some role in the analysis, Mueffelman, 470 F.3d at 41, even that disparity[3] does not necessarily justify a substantial deviation from the Guidelines absent compelling justification.  We have also been clear that disparities with sentences imposed by other judges on co-defendants can play an even lesser role in the analysis for several reasons.  One is that the other judge's reasons for the sentence are not fully known.  Saez, 444 F.3d at 19; see also id. ("But with different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second.").  Another is that this would lead "to endless rummaging by lawyers through sentences in other cases" to find specific examples, and create a model of analysis which is "about the weakest sort of proof of national practice that can be imagined." Id.  The court here erred in the significance it gave to the sentence imposed on a co-defendant by a different judge.

---

[3]    Indeed, the sentence imposed created a disparity contrary to and not consistent with "the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6); see also United States v. Taylor, ___ F.3d ___, 2007 WL 2349415, at *8-9 (1st Cir. Aug. 17, 2007).

-11-

Further, the two defendants were not similarly situated. The record does not uphold the court's assessment that Tom was "less culpable" than Wang. It is true that Wang was the insider who initiated the conspiracy. Yet the record is clear that Tom was Wang's senior and her mentor. He did not use his influence with Wang to stop the scheme. To the contrary, he exploited his mentor relationship and was actively involved in, had numerous conversations with Wang about, and tried to milk maximum illicit profit from their scheme. He made over fifty trades, tipped his own brother, and reaped together with his brother close to $800,000 in profits.

While the court did recognize that Wang had cooperated and Tom had not, it did not give enough weight to this difference in circumstances. "Although a district court may consider disparities among co-defendants in determining a sentence, [a defendant's] sentence [is not] unreasonable simply because his co-defendant[] agreed to help the government in exchange for [a] reduced sentence[]." United States v. Vázquez-Rivera, 470 F.3d 443, 449 (1st Cir. 2006); see also Saez, 444 F.3d at 18 (justifying sentence disparity by describing co-defendant's cooperation); United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005) ("[D]ifferences between the appellant's belated and grudging

cooperation and [co-defendant's] prompt and full cooperation sensibly account for the differing sentences.").[4]

Further, Tom was the dominant figure in the activity amounting to obstruction of justice.  Tom not only gave false testimony under oath to the SEC, but he convinced Wang to perjure herself so that the stories would be consistent.  He then created a false document to replace a damning original document.

As a separate ground, we also agree with the government that this lenient sentence undermined the strong congressional interest in deterring others from committing similar crimes.  In particular, "deterrence of white-collar crime [is] of central concern to Congress." Mueffelman, 470 F.3d at 40.  In Taylor, we found a sentence without imprisonment for a white-collar defendant

---

[4]     Other circuits have also taken this view.  See, e.g., United States v. Caine, 487 F.3d 1108, 1114-15 (8th Cir. 2007) (upholding as reasonable a sentence twice as long as that received by an allegedly more culpable co-defendant because co-defendant's cooperation and testimony rendered him "not similarly situated"); United States v. Ramirez, 221 Fed. Appx. 883, 887-88 (11th Cir. 2007) (upholding as reasonable a sixteen-year sentence for a defendant without a criminal history, when the defendant with the "central role" received only a seven-year sentence but had assisted the government's investigation); United States v. Boscarino, 437 F.3d 634, 638 (7th Cir. 2006), cert. denied, 127 U.S. 3041 (2007) (upholding as reasonable a sentence longer than that imposed on a co-defendant who cooperated, and noting that a "sentencing difference is not a forbidden 'disparity' if it is justified by legitimate considerations, such as rewards for cooperation").

unreasonable in part because it did not satisfy this interest in deterrence.[5]  2007 WL 2349415, at *8.

Similarly, the availability of SEC sanctions does not justify this sentence.[6]  The fact that the SEC may order disgorgement and monetary penalties[7] is no substitute for the fact that Congress made this offense a crime, subject to imprisonment. Our case law has already rejected this argument.  In Jiménez-Beltre, we found that the presence of other sanctions was not a persuasive ground for a reduced sentence.  440 F.3d at 520.  All investment advisors who engage in insider trading are subjected to such civil punishment, so "[t]he guideline sentencing range was

---

[5]    There, we noted that Congress has explained:
> The placing on probation of [a white-collar criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

Taylor, 2007 WL 2349415, at *8 (quoting S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75).

[6]    Tom volunteered the settlement with the SEC that barred him from associating with investment advisors.  In addition, it is not clear that a heavier sentence will lead to increased overall punishment, as the SEC has agreed to hold its civil case in abeyance until the conclusion of the criminal matter.  Indeed, defendant's counsel informed the district court that "the SEC in this matter would like to see what [the court] does, and based on what [the court] does, do what it deems appropriate anything additional [sic]."

[7]    The pre-sentence report stated that Tom had a net worth of more than a million dollars.  The court adopted the report without change.

likely predicated on this understanding." Id.; see also Koon v. United States, 518 U.S. 81, 110-11 (1996). Because it is commonplace for a defendant to lose his ability to practice a profession (in this case, Tom's ability to be an investment advisor or be associated with an advisor), that career harm is not a valid ground for departure. United States v. Hoffer, 129 F.3d 1196, 1203-04 (11th Cir. 1997) (finding loss of medical license an invalid basis for departure); cf. Koon, 518 U.S. at 110 (finding an abuse of discretion when sentencing judge based downward departure on potential for defendants' "career loss"). By definition, the fact that Tom has lost his license does not distinguish him from others convicted of insider trading. See 15 U.S.C. § 80b-3(f) (allowing the SEC to bar those convicted of insider trading from association with investment advisors).

Further, his argument would lead to problematic class distinctions: white-collar criminals would be able to avoid imprisonment while non-professionals would be imprisoned because the latter have neither a license to lose nor substantial sums of money to pay civil sanctions. Sentences for white-collar criminals should have the following effects: "deterrence of white-collar crime . . . , the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail." Mueffelman, 470 F.3d at 40. See also Thurston III, 456 F.3d at 218. The

-15-

rationale here cannot, consistent with the interest in national uniformity in sentencing, reasonably be the basis for a below-Guidelines sentence.

This leaves the district court's third stated reason, the "family problem" rationale for departure. The court correctly recognized this rationale could not, on its own, justify a departure. The other two grounds could not justify the sentence given. Throwing this rationale into the mix does not make an unreasonable sentence reasonable.

We believe the government is correct that some term of imprisonment is required for the sentence to be reasonable on the facts of this case. Such a result is consistent with our precedent. In Taylor, the court found unreasonable a sentence of probation and time in a halfway house for a white-collar defendant who had also obstructed justice. 2007 WL 2349415, at *1; see also Thurston III, 456 F.3d at 220 (finding, when a district court judge sentenced a white-collar defendant to three months' imprisonment although the Guidelines recommendation was sixty months, that any sentence below thirty-six months of imprisonment would be unreasonable); United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (holding that a seven-day sentence of imprisonment for a white-collar defendant was unreasonable).

Tom argues his sentence includes confinement: that the sentence of six months' community confinement is the equivalent of

a prison sentence. We reject the argument. Most fundamentally, community confinement for whatever period is not the same as imprisonment for thirty-six months. See United States v. Rattoballi, 452 F.3d 127, 135, 137 (2d Cir. 2006) (finding unreasonable a sentence that substituted one year of home confinement and five years' probation for a Guidelines range between twenty-seven and thirty-three months' imprisonment); United States v. Elkins, 176 F.3d 1016, 1020 (7th Cir. 1999) ("Community confinement . . . do[es] not [itself] constitute 'imprisonment.'"). [Further, even if it were, a six-month sentence is only 16% of a thirty-six-month sentence.]

Tom points to U.S.S.G. § 5C1.1(e)(2), which establishes a schedule under which one day of community confinement may be substituted for one day of imprisonment for purposes of conforming with the Guidelines. His very argument refutes itself: this substitution holds true only for Guideline ranges that fall within Zones B and C of the Sentencing Table. Tom's uncontested Guidelines range was thirty-seven to forty-six months, which falls solidly within Zone D, and for which the Guidelines provide no substitute punishment for imprisonment. U.S.S.G. § 5C1.1(f); see also United States v. Mercado, 412 F.3d 243, 253 n.4 (1st Cir. 2005) (noting that community confinement cannot substitute for imprisonment for Zone D sentences under the Guidelines); United States v. Martin, 363 F.3d 25, 40 n.25 (1st Cir. 2004) ("[B]ecause

Zone D does not allow for [community confinement], the conversion ratio . . . is inapplicable to this case by the terms of the Guidelines themselves.").   Even for sentences within Zone B or Zone C, some minimum term of imprisonment must be served under the Guidelines:  for Zone B sentences, there must be at least one month of imprisonment, and for Zone C sentences at least one-half of the minimum term must be served in prison.  U.S.S.G. § 5C1.1(c), (d); see also United States v. Cintrón-Fernández, 356 F.3d 340, 347-48 (1st Cir. 2004).

Further, we have recognized that community confinement is "considered as [one of the] 'Substitute Punishments' for imprisonment, not [a] merely different form[] of imprisonment itself."  Cintrón-Fernández, 356 F.3d at 347; see also United States v. Serafini, 233 F.3d 758, 777 (3d Cir. 2000) (stating community confinement cannot constitute imprisonment for purposes of fulfilling the requirement that one-half of a split sentence be satisfied by imprisonment under section 5C1.1); United States v. Adler, 52 F.3d 20, 21 (2d Cir. 1995) ("'Imprisonment' and 'community confinement' are not synonyms.").

We reverse the sentence and remand for resentencing in accord with this opinion.