# United States Court of Appeals
## For the First Circuit

No. 17-1597

UNITED STATES OF AMERICA,

Appellee,

v.

MUSTAFA HASSAN ARIF,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

Benjamin Brooks, with whom Michael Schneider and Good
Schneider Cormier & Fried were on brief, for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom
Scott W. Murray, United States Attorney, was on brief, for
appellee.

July 18, 2018

**LYNCH, Circuit Judge.** Mustafa Hassan Arif operated a very profitable online business from Lahore, Pakistan, selling non-prescription drug products that purported to treat or cure hundreds of different diseases and medical conditions. He created and operated over 1,500 websites containing altered clinical studies, fabricated testimonials, and false indicia of origin to induce consumers in the United States and elsewhere to purchase his products. Through his misdeeds, Arif gained more than $11 million in revenues. He conditionally pled guilty to wire fraud in 2016, preserving two arguments for appeal that the district court had rejected in two thoughtful memoranda. See United States v. Arif (Arif I), No. 15-cr-057 (D.N.H. Sept. 16, 2016); United States v. Arif (Arif II), No. 15-cr-57, 2016 WL 5854217 (D.N.H. Oct. 6, 2016). Arif was sentenced to seventy-two months of imprisonment.

On appeal, Arif's primary argument is that he was prosecuted under the wrong statute. We reject Arif's argument that prosecutions such as his must be pursued exclusively by the Federal Trade Commission ("FTC") as false advertising cases, and not by the Department of Justice ("DOJ") as wire fraud cases.[1] As

---

[1] Arif never maintained in district court that the criminal provisions of the Federal Trade Commission Act, 15 U.S.C. §§ 52-57, must be prosecuted by the FTC. Rather, he argued that the DOJ may only initiate a prosecution for violations of these provisions upon certification from the FTC under 15 U.S.C. § 56(b). The district court rejected this argument, and Arif has abandoned

an issue of first impression, we hold that Congress did not impliedly repeal the wire fraud statute, 18 U.S.C. § 1343, as to prosecutions that also fall within the reach of the 1938 Wheeler-Lea Amendment to the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §§ 52-57.[2]

Arif also argues that, as a matter of law, he could not have committed fraud because he "held an honest and sincere belief in the efficacy of his products," and he correctly identified their ingredients.

Arif's remaining arguments are that his seventy-two month sentence must be vacated because the district court's Guidelines calculation as to the loss amount was erroneous and, further, because the court did not "adequately account" in its sentence for the fact that his penalty would have been lower had he been charged under the FTCA.

All of Arif's arguments are without merit. Accordingly, we affirm both his conviction and sentence.

---

it on appeal. See Small Justice LLC v. Xcentric Ventures LLC, 873 F.3d 313, 323 n.11 (1st Cir. 2017) (holding that arguments not raised in appellant's opening brief are waived).

[2] One motivation for Arif's argument seems to be that under the FTCA, there is a six-month maximum penalty for a first offense, and a one-year maximum for a second offense. See 15 U.S.C. § 54(a). In contrast, there is a twenty-year maximum sentence for fraud under the wire fraud statute. See 18 U.S.C. § 1343.

# I. <u>Facts</u>

The following facts are drawn from Arif's conditional guilty plea and from the district court's findings of fact.

Arif ran an elaborate, multi-million-dollar online business from Lahore, Pakistan, selling non-FDA-approved drugs that purported to cure hundreds of different diseases and medical conditions. He primarily operated his business through MAK International, a "parent company" he owned. Arif also worked with CCNow, a third-party payment processor based in the United States.

To sell his products, Arif created, maintained, and controlled more than 1,500 websites. Over 1,000 of these websites directly offered drugs for sale, with each individual website selling a single drug that purported to treat a single disease or medical condition. The remaining 400 or so websites were "referral" sites, which purported to be "independent and impartial," but were, in fact, conduits to one or more of Arif's websites selling his products.

Arif organized his websites into subnetworks or groups, each with a unique brand name and color scheme. These included Berlin Homeo (comprising more than 250 sites), Botanical Sources (comprising more than 200 sites), Gordon's Herbal Research Center (comprising more than 120 sites), Healing Plants Ltd. (comprising more than 60 sites), Oslo Health Network (comprising more than 300 sites), and Solutions by Nature (comprising more than 70 sites).

He also created two referral networks: "Society for the Promotion of Alternative Health" and "Toward Natural Health."  In general, each website within a group "contained the same verbiage," with "the only material difference being the name of the disease or medical condition, the name of the drug, and the variations in the purported ingredients."

All of the websites contained misleading mail-forwarding addresses that were "intended to make customers more comfortable purchasing the drugs."  For instance, websites in the Berlin Homeo network included an address in Germany.  Websites in the other networks contained forwarding addresses in Italy, New Zealand, Australia, Norway, Denmark, England, and Scotland.  In fact, all of the drugs originated in Pakistan.

Most of the websites also contained various other false and misleading statements.  For instance, many websites in the Solutions by Nature group contained the following (completely fabricated) treatment statistics:

> [Name of drug] has been shown in clinical trials to provide a complete [name of disease or medical condition] cure rate for 90% of subjects.  [Name of drug] has been proven an effective [name of disease or medical condition] medication for 95% of people, significantly improving their condition. Like no other product, has also been shown to be a highly effective [name of disease or medical condition] treatment in people with severe cases, a response rate of 85%.

Additionally, certain websites contained links to plagiarized research papers, which "were not written about the drugs they purported to reference." And many touted fictitious testimonials by customers.

Arif sold the drugs globally, generating approximately $12 million in sales between 2007 and 2014, more than $9 million of which came from customers in the United States. CCNow processed his customers' online payments and then sent the proceeds from its bank account in Minnesota to Arif's bank accounts in Pakistan and the United Kingdom via wire transfers through JP Morgan Chase.

On April 8, 2015, a federal grand jury in the District of New Hampshire indicted Arif on one count of wire fraud and aiding and abetting the same, in violation of 18 U.S.C. §§ 1353 and 2, and two counts of shipment of misbranded drugs in interstate commerce, in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and 352(a).[3] A superseding indictment was filed on September 9, 2015,

---

[3] The briefs provide no information on the origins of the investigation into Arif's businesses. However, Arif's indictment and pre-trial briefing offer the following account. On or about April 14, 2010, an undercover agent from New Hampshire purchased a product from one of Arif's websites. When Arif landed in New York City on February 2, 2014, Department of Homeland Security special agents were notified and drafted a criminal complaint charging Arif with wire fraud. The agents appeared before a magistrate judge in the district of New Hampshire on February 7th, and an arrest warrant was issued that same day. The original February 2014 criminal complaint against Arif was sealed until he was arrested in the Southern District of New York.

adding two additional counts of shipment of misbranded drugs in interstate commerce and aiding and abetting the same.

Arif waived his right to a jury trial. He filed two pre-trial motions asking the district court to rule, as a matter of law, on his good faith defense (that he lacked the requisite intent to defraud), and on his jurisdictional defense (that the 1938 amendment to the FTCA "preempted" the wire fraud statute as to his offense). The district court denied the motions in two separate orders.

On October 11, 2016, Arif pled guilty to one count of wire fraud, pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, reserving the right to appeal the district court's adverse rulings. He was sentenced to seventy-two months of imprisonment on May 26, 2017. On appeal, Arif challenges his conviction and sentence.

## II. Analysis

A. The FTCA Does Not Impliedly Repeal the Wire Fraud Statute

Throughout his briefing, Arif couches his argument as one of the "preemptive effect" of the FTCA over the wire fraud statute. We believe that this categorization is incorrect. In the end, the issue is one of congressional intent. "The proper mode of analysis" in situations such as this, when there is an alleged conflict between an earlier and a later statute is "that

of implied repeal."  State of Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 703 (1st Cir. 1994).

"The cardinal rule is that repeals by implication are not favored."  Posadas v. Nat'l City Bank of N.Y., 296 U.S. 497, 503 (1936); see also Narragansett, 19 F.3d at 703.  The federal judiciary must faithfully adhere to this rule of construction not only as a matter of logic, but also, of principle.  It serves to honor the doctrine of separation of powers by showing respect for the legislative branch.

> A steady adherence to [the implied repeal doctrine] is important, primarily to facilitate not the task of judging but the task of legislating.  It is one of the fundamental ground rules under which laws are framed.  Without it, determining the effect of a bill upon the body of preexisting law would be inordinately difficult, and the legislative process would become distorted by a sort of blind gamesmanship, in which Members of Congress vote for or against a particular measure according to their varying estimations of whether its implications will be held to suspend the effects of an earlier law that they favor or oppose.

United States v. Hansen, 772 F.2d 940, 944 (D.C. Cir. 1985) (Scalia, J.).

We put aside the fact, inconvenient to Arif,[4] that the FTCA provision said to impliedly repeal the wire fraud statute was

---

[4]    Arif's premise that an earlier Congress can preclude a later Congress from enacting new laws is itself unsound.  See Ray v. Spirit Airlines, Inc., 767 F.3d 1220, 1225 (11th Cir. 2014) (holding that "[r]egardless of whether the FAA established a

- 8 -

enacted in 1938, see 15 U.S.C. § 54, long before the wire fraud statute came into effect in 1952, see 18 U.S.C. § 1343. Because the wire fraud statute was premised on the mail fraud statute, however, and that statute was first enacted in 1872, see Skilling v. United States, 561 U.S. 358, 399 (2010), we will assume arguendo, in Arif's favor, that the wire fraud statute came first and that the usual rules for evaluating implied repeal apply.

The Supreme Court has long held that repeals by implication may not be found "unless [Congress's] intent to repeal is 'clear and manifest.'" Rodriguez v. United States, 480 U.S. 522, 524 (1987) (per curiam) (quoting United States v. Borden Co., 308 U.S. 188, 198 (1939)). This, in turn, requires either a showing that "the later act covers the whole subject of the earlier one and is clearly intended as a substitute," Posadas, 296 U.S. at 503, or that an "irreconcilable conflict" exists between the provisions of the two statutes, Rodriguez, 480 U.S. at 524.

Under the first test, this is plainly not a situation where a later statute (here, assuming arguendo, the FTCA is later), covers the same subject matter as an earlier statute (again, assuming arguendo the wire fraud statute is earlier) so comprehensively that it is meant as a substitute.

---

'comprehensive federal regulatory scheme governing air carriers,'" the "1958 FAA could not have repealed any part of the yet-to-be-born 1970 RICO statute" (quoting Musson Theatrical, Inc. v. Fed. Express Corp., 89 F.3d 1244, 1250 (6th Cir. 1996))).

- 9 -

So we focus instead on the second test: whether there is an "irreconcilable conflict" between the two statutes. We find no such conflict on the face of the statutes.[5] To state the obvious, the FTCA and the wire fraud statute address different activities. The wire fraud statute requires the use of "wires"; the FTCA does not. Compare 18 U.S.C. § 1343 (proscribing "[f]raud by wire, radio, or television"), with 15 U.S.C. § 52 (proscribing the "[d]issemination of false advertisements"). Further, the FTCA applies only to false advertising, whereas the wire fraud statute covers fraud generally.[6] See, e.g., United States v. Meléndez-González, 892 F.3d 9, 13-14, 20 (1st Cir. 2018) (affirming wire fraud conviction for submitting false information to the military in order to obtain recruitment bonuses).

---

[5] Since the text of the statutes is clear, we do not resort to examining the legislative history. See Star Athletica, L.L.C. v. Varsity Brands, Inc., 137 S. Ct. 1002, 1010 (2017) (holding that a "controlling principle" of statutory interpretation is "the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written" (quoting Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992))). However, in an abundance of caution, we add that the legislative history of the two statutes, as described in the parties' briefing, does not even begin to show any conflict. The arguments are described later in the text of this opinion.

[6] Indeed, "both Congress and the Supreme Court have repeatedly placed their stamps of approval on expansive use of the mail fraud statute," the predecessor to the wire fraud statute at issue in this case. See Jed S. Rakoff, The Federal Mail Fraud Statute, 18 Duquesne L. Rev. 772-73 (1980).

- 10 -

Even if the two statutes do overlap in some situations, such as this one, "[that] is not enough to establish" an implied repeal; the FTCA "may be merely affirmative, or cumulative or auxiliary" to the wire fraud statute. Ray v. Spirit Airlines, Inc., 767 F.3d 1220, 1225 (11th Cir. 2014) (quoting Wood v. United States, 41 U.S. 342, 363 (1842)). That Arif cannot point to any "positive repugnancy" between the two statutory provisions is fatal to his claim of implied repeal. Wood, 41 U.S. at 363.

Further, the Supreme Court has held that "[w]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed Congressional contention to the contrary, to regard each as effective." FCC v. NextWave Personal Commc'ns Inc., 537 U.S. 293, 304 (2003) (quoting J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l Inc., 534 U.S. 124, 143-44 (2001)). Co-existence is more than possible here.

Arif purports to find support for the contrary in the Supreme Court's decision in Dowling v. United States, 473 U.S. 207 (1985). But Dowling is not a case about implied repeal at all. It dealt with an issue of statutory interpretation: whether the felony provision of the National Stolen Property Act, 18 U.S.C. § 2314, extended to the interstate transportation of bootlegged records. See Dowling, 473 U.S. at 208. Because the statutory language was ambiguous, the Court turned to legislative history. See id. at 218. It concluded that "Congress had no intention to

reach copyright infringement when it enacted § 2314," id. at 226, given its later enactment of amendments to the Copyright Act, which included criminal penalties for infringement. See id. at 225-26. The Court's approach in Dowling to statutory interpretation is inapplicable here because the text of the wire fraud statute is clear. And Arif makes no argument that the plain language of the statute does not embrace his conduct.

Arif nevertheless insists that we turn to the legislative history of the FTCA because he says that it shows Congress intended the FTC to have sole enforcement authority over false advertising cases. He cites to three cases that he argues establish, as a matter of statutory construction, that the wire fraud statute cannot be read to reach his conduct: Tamburello v. Comm-Tract Corp., 67 F.3d 973 (1st Cir. 1995), United States v. Boffa, 688 F.2d 919 (3d Cir. 1982), and Holloway v. Bristol-Myers Corp., 485 F.2d 986 (D.C. Cir. 1973). None of these cases are helpful to him.

Tamburello and Boffa both concern unfair labor practices, defined by the National Labor Relations Act ("NLRA"), which is administered by the National Labor Relations Board ("NLRB"). See Tamburello, 67 F.3d at 976; Boffa, 688 F.2d at 927. But the NLRA and FTCA are not analogous. Congress clearly intended the NLRA to be a "uniform, nationwide body of labor law interpreted by a centralized expert agency -- the [NLRB]." Tamburello, 67

- 12 -

F.3d at 976.  And the Supreme Court has long recognized the primary jurisdiction of the NLRB.  See Nat'l Licorice Co. v. NLRB, 309 U.S. 350, 365 (1940).

Here, were we forced to consider it, the legislative history of the 1938 Wheeler-Lea Amendment shows quite the opposite of what Arif argues.  The House Report supporting the amendment's enactment clearly states that the "criminal offenses will not be prosecuted by the Federal Trade Commission, but through the Department of Justice."  H.R. Rep. No. 75-1613, at 6 (1937).  There is no indication whatsoever that Congress intended all cases involving false advertising to be prosecuted solely by the FTC under the FTCA and no other criminal statute.

Arif cites Holloway, but that case only held that the FTCA does not create a private right of action, 485 F.2d at 999, an issue not presented here.  The D.C. Circuit gave an informative description of the FCTA and the 1938 Wheeler-Lea Amendment, no part of which suggests that Congress intended to preclude criminal wire fraud prosecutions for conduct also covered by the FTCA.  See id. at 992-97.

It is true that the Third Circuit held in Boffa that the mail fraud statute does not extend to deprivations of rights which are created only by section 7 of the NLRA.  688 F.2d at 930.  But that case is inapposite here.  The FTCA created no rights, unlike the statutory creation in the NLRA of the duty of fair

- 13 -

representation, which was enforced by the NLRB in a comprehensive scheme. Further, Boffa itself expressly held that the NLRA did not impliedly repeal the mail fraud statute as to conduct that was "arguably prohibited" by the NLRA and "independently prohibit[ed]" by the mail fraud statute. Id. at 932.

Tamburello is also plainly inapposite. It concerned the reach of the NLRB's primary jurisdiction over a private, non-governmental cause of action alleging a RICO extortion claim. See Tamburello, 67 F.3d at 976. As we held there, the NLRB had exclusive jurisdiction because none of the conduct "[was] illegal without reference to the NLRA. It is the NLRA that prohibits employers from creating intolerable working conditions to discourage union activities." Id. at 978 (citations omitted). That is not at all the situation here.

To the extent Arif tries to find significance in the lower penalties associated with prosecutions under the FTCA, his argument also goes nowhere. The Supreme Court squarely rejected this notion in United States v. Batchelder, 442 U.S. 114 (1979). There, the Court held that "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." Id. at 123-24.

We have also rejected arguments of implied repeal of the wire fraud statute by another statute on this basis. In United

- 14 -

States v. Brien, 617 F.2d 299 (1st Cir. 1980), we held that the Commodities Futures Trading Act, a statute targeting the specific type of fraud in that case, did not impliedly repeal the general mail and wire fraud statutes, even though it carried a lesser maximum sentence. See id. at 309-310, 310 n.14. We further noted that "[t]he government's election to prosecute appellants under the statute which, at the time, provided the more severe penalty, was an exercise of discretion that violated no rights of appellants." Id. at 310-11.

Other circuits have adopted similar reasoning. See Hansen, 772 F.2d at 945 (government could charge defendant criminally under 18 U.S.C. § 1001 for making false statements, instead of under the Ethics in Government Act, which only imposes civil penalties); United States v. Zang, 703 F.2d 1186, 1196 (10th Cir. 1982) (misdemeanor provisions of the Emergency Petroleum Allocation Act did not impliedly repeal the mail and wire fraud statutes as to conduct that violated both); United States v. Burnett, 505 F.2d 815, 816 (9th Cir. 1974) (government could charge defendant criminally under § 1001, instead of under a specific misdemeanor statute for making false statements to obtain unemployment benefits).

This case provides a good example for why Congress has vested discretion in the prosecutorial agencies as to which statute to employ. The offense here was not a run-of-the-mill false

- 15 -

advertising of a single product. Arif, in order to make millions, mounted an elaborate worldwide scheme to defraud: he deliberately posted numerous false and misleading statements on over a thousand websites that he created and maintained in order to gull those with medical ailments into purchasing his products. The FTCA penalties for first or second offenders would hardly have been an adequate deterrent for such egregious conduct. Crime must be made not to pay.

B.   Rejection of Arif's Defense as to Intent to Defraud

Arif next argues that the district court erred in rejecting his defense that he did not commit wire fraud because he was pure of heart and mind as to the efficacy of his products.

Both parties requested that the district court rule on this defense before trial, based on the agreed-upon stipulated facts.[7] The court also considered Arif's assertions in his pro se briefs, which the court construed in his favor (such as accepting Arif's assertion that he had a good-faith belief in the efficacy

---

[7]    Arif's counsel presented, but refused to endorse, Arif's good faith defense in its trial briefing. Consequently, Arif sought leave to argue his good faith defense pro se. The district court permitted him to do so. Arif then filed a pre-trial motion asking the district court to rule on the issue as a matter of law. Shortly after the district court denied this motion, Arif pled conditionally guilty, reserving the right to challenge the district court's ruling.

of the drugs[8] that he had sold on his websites).  Arif insists on appeal, as he did before the district court, that he is entitled to a finding that he lacked the requisite intent to commit wire fraud as a matter of law.

The well-established elements of wire fraud are: "(1) a scheme or artifice to defraud using false or fraudulent pretenses; (2) the defendant's knowing and willing participation in the scheme or artifice with the intent to defraud; and (3) the use of the interstate wires in furtherance of the scheme."  United States v. Appolon, 715 F.3d 362, 367 (1st Cir. 2013).  The district court correctly rejected Arif's legal defense that the elements of the wire fraud statute were not met because he did not subjectively intend to commit fraud.

Arif's argument misapprehends the nature of his charged offenses.  The trial judge accurately ruled that Arif was not being charged "with selling drugs that did not work as intended . . . or for harming his customers."  Rather, he was charged with "making misrepresentations on his websites," which were designed to give false comfort to buyers, in order to induce their purchases. Specifically, Arif pled guilty to knowingly misrepresenting, inter

_____

[8]     The district court used the definition of "drug" in the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 321(g)(1). Arif's brief uses the language "homeopathic and naturopathic herbal remedies," but he does not deny that the products are drugs under the FDCA.

alia, that: (1) there was clinical research showing outstanding results for the drugs he sold, including specific cure rates; (2) actual customers attested to the efficacy of the drugs; and (3) his businesses were operating from various western countries.

Those admissions are more than enough to satisfy the intent requirement. In United States v. Mueffelman, 470 F.3d 33 (1st Cir. 2006), this court expressly held that a wire-fraud defendant cannot "knowingly . . . make false statements to secure money from clients" even if he subjectively "believe[s] that his enterprise w[ill] succeed."[9] Id. at 37. So too here. Arif's belief in the efficacy of his products does not negate his fraudulent intent when he knowingly made false statements that went to the heart of his customer's purchases.

Arif counters that the district court erred in relying on Mueffelman because that case dealt with financial fraud, whereas his case concerns "a form of alternative medicine." We do not see

---

[9] Our Mueffelman ruling is in accord with the ruling of other circuits that a defendant's subjective good-faith belief in the efficacy of the product does not negate his intent to defraud when the defendant has made false statements to induce purchase. See United States v. Spirk, 503 F.3d 619, 622 (7th Cir. 2007) (holding that a good-faith belief that investors would profit does not negate defendant's intent to defraud); United States v. Benny, 786 F.2d 1410, 1417 (9th Cir. 1986) (holding that although an honest belief in the truth of misrepresentations may negate an intent to defraud, a good-faith belief that the victim will suffer no loss is "no defense at all"); accord United States v. Stull, 743 F.2d 439, 446 (6th Cir. 1984); Sparrow v. United States, 402 F.2d 826, 828 (10th Cir. 1968); United States v. Painter, 314 F.2d 939, 943 (4th Cir. 1963).

this supposed distinction.  A lie is a lie, whether it is in the form of a falsified financial statement or a falsified clinical study of a drug.  There was no error.

Further, Arif's reliance on the Sixth Circuit's opinion in Harrison v. United States, 200 F. 662 (6th Cir. 1912) -- a more-than-a-century-old decision that predates both the FTCA and the wire fraud statute -- is also misplaced.  Arif asserts that Harrison stands for the proposition that "misrepresentations . . . relating to the advertised efficacy" of a product are merely "a form of puffery or exaggeration," as long as "there [is] an 'inherent utility' to the product sold."  Not so.  Harrison never held as much.  Arif's proposed reading contradicts the substantial body of law that establishes that the demarcation line is between misrepresentations that go to the essence of a bargain and those that are merely collateral.  See, e.g., United States v. Regent Office Supply Co., 421 F.2d 1174, 1179-1181 (2d Cir. 1970).

Here, the misrepresentations Arif made were plainly material.  By falsifying the origin of his products, clinical studies about them, and customer testimonials, Arif clearly intended to deprive his victims of the "facts obviously essential in deciding whether to enter the bargain."  United States v.

- 19 -

London, 753 F.2d 202, 206 (2d Cir. 1985).  This is not a case of mere exaggeration or puffery.[10]

We also reject Arif's argument that the disclaimer on the third-party credit-card processor's website shows that the trial judge erred.  That disclaimer stated, in pertinent part:

> [T]he product(s) purchased are not intended to diagnose, mitigate, treat, cure or prevent any disease or health condition, and I will not use any information or statements contained on the website through which this product is purchased, or contained on or in such product(s), for such purposes.

Arif argues that after reading this statement, any potential customer of "reasonable prudence" would have known not to rely on the other statements made on his websites; therefore, "the misrepresentations did not persist through the point of sale." But reliance is not an element of wire fraud.  Cf. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 642, 649-50 (2008) (holding that "a showing of reliance" is not required for mail fraud).  Accordingly, the presence of a disclaimer does not defeat Arif's criminal liability under the wire fraud statute.  See United

---

[10]    Also beside the point is Arif's argument that the trial judge erred in not drawing a distinction "between a lie or misrepresentation[] and a specific intent to defraud."  This assertion boils down to an argument that Arif's misrepresentations were not material.  As explained above, these misrepresentations in sum were plainly material.  We do not disaggregate the different types of misrepresentations charged, and so do not reach questions of whether any one of them, independently, would suffice.  Nor does Arif make such an argument.

States v. Weaver, 860 F.3d 90, 95 (2d Cir. 2017); United States v. Ghilarducci, 480 F.3d 542, 546-47 (7th Cir. 2007).

Finally, Arif argues that even if his intent argument was irrelevant, he nonetheless should have been able to present his good-faith belief to the fact finder, in the hopes of exoneration. That is not how the issue was framed to the trial court, so the argument is waived. And there is no Sixth Amendment right to present a defense based on irrelevant evidence. See United States v. DeCologero, 530 F.3d 36, 72-74 (1st Cir. 2008).

We add that, in any event, the argument is misplaced. Arif chose not to take his case to a jury or to have a bench trial. He chose to plead guilty, presumably because it would give him some benefits. After all, the prosecution agreed to dismiss the remaining four counts of shipping misbranded drugs in commerce and aiding and abetting the same, which each carried a maximum penalty of three years of imprisonment, see 21 U.S.C. § 333(a)(2). By pleading guilty, Arif reduced his potential sentence range.

C. There Was No Guidelines Calculation Error

We turn to address Arif's challenges to his sentence. First, he contends that the district court erred in calculating the Guidelines range by using Arif's total revenues, minus refunds, as the loss figure. Specifically, Arif argues that the sales from one group of websites, Botanical Sources, should have been excluded from the loss amount because those websites did not contain any

misrepresentations about the products, only a misleading forwarding address.  He also argues that the government failed to prove that his customers were dissatisfied or suffered any pecuniary harm, as there were only five complaints out of over 128,000 transactions, and "only a small percentage of customers" sought refunds "even though the product was clearly marked as being from Pakistan."  We see no error.

Under this court's decision in United States v. Alphas, 785 F.3d 775 (1st Cir. 2015), "a sentencing court may use the face value of the claims as a starting point in computing loss," where, as here, "defendant's claims were demonstrably rife with fraud." Id. at 784.  "The burden of production will then shift to the defendant, who must offer evidence to show (if possible) what amounts represent legitimate claims."  Id.

Here, the district court gave Arif the opportunity to show that a portion of the revenue obtained was not infected by the fraudulent misrepresentations and it concluded that he had presented insufficient evidence to that effect.  There was no clear error in that factual conclusion.  That some customers may not have been dissatisfied after making purchases from sites with false information has no bearing on the loss amount, which is intended to reflect the revenue from sales that were induced by Arif's fraudulent misrepresentations.

In any event, even if the loss calculation was in error, there would have been "no reasonable probability" of prejudice. Molina-Martinez v. United States, 136 S. Ct. 1338, 1346 (2016). The sentencing judge departed substantially downward from the Guidelines range. The judge explained that regardless of the Guidelines calculation, she would have "reach[ed] the same result with respect to the appropriate sentence, via this variance" because "a 72-month sentence is a fair and just sentence based on . . . the totality of circumstances and totality of facts in the record." Accordingly, any error would have been harmless. See id. at 1347; United States v. Romero-Galindez, 782 F.3d 63, 70 (1st Cir. 2015).

D.   The Sentence Was Substantively Reasonable

Next, Arif argues that his sentence was substantively unreasonable because the trial judge "failed to take adequate account" of the six-month maximum sentence under the FTCA. Despite his failure to object at sentencing, we assume, favorably to Arif, that our standard of review is for abuse of discretion. See United States v. Tanco-Pizarro, 892 F.3d 472, 483 (1st Cir. 2018).

His argument clearly fails under any standard. The district court obviously was not restricted to the FTCA range of penalties, and it had been made well aware of that range. In imposing the seventy-two-month sentence, the court noted that Arif's colloquy at sentencing failed to demonstrate "complete and

- 23 -

utter total remorse."  Nevertheless, the trial judge still imposed a sentence well below the recommended Guidelines range of 134 to 168 months.

There was no error at all in the sentence; it was not unreasonably long.

Affirmed.