# United States Court of Appeals
## For the First Circuit

No. 19-1100

UNITED STATES,

Appellee,

v.

RICARDO RIVERA-ORTIZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

Victor J. Gonzalez-Bothwell, with whom Eric Alexander Vos, Vivianne M. Marrero, Franco L. Pérez-Redondo, Liza L. Rosado-Rodríguez, and Iván Santos-Castaldo were on brief, for appellant.
Robert Paul Coleman III, Assistant United States Attorney, with whom B. Kathryn Debrason, Assistant United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, and W. Steven Muldrow, United States Attorney, were on brief, for appellee.

September 21, 2021

**LIPEZ, Circuit Judge**.  After suffering a work injury as a mechanic for the United States Postal Service ("USPS"), Ricardo Rivera-Ortiz began receiving worker's compensation and Social Security disability benefits.  As a condition of receiving those benefits, Rivera had to file forms indicating whether he was undertaking any work or volunteer activities.  At some point, after Rivera had been receiving benefits for years, the USPS Office of the Inspector General ("OIG") began investigating his case.  It determined that he had continued working and volunteering with his union, the American Postal Workers' Union ("APWU"), without disclosing those activities as required.  Rivera was eventually charged with making false statements on the relevant government forms, theft of government property, and failing to disclose an event that affected his right to Social Security payments.  A jury found him guilty on all counts.  He now challenges the sufficiency of the evidence to support the convictions, the exclusion of certain mitigating evidence, and some aspects of his sentence.  We reject these challenges and affirm in all respects.

**I.**

**A. Factual Background**

The following facts come from the testimony and exhibits presented at trial.  "Since one of the claims addressed in this opinion is a challenge to the sufficiency of the evidence, we

- 2 -

recount the facts in the light most favorable to the verdict." United States v. Paz-Alvarez, 799 F.3d 12, 18 (1st Cir. 2015).

On May 25, 2005, while working as a maintenance mechanic for USPS, Rivera tripped on a mat and fell, hurting his neck and right knee. As a result of this incident, he filed a claim for compensation and disability benefits on June 3, 2005 with the Department of Labor, Office of Workers' Compensation Programs ("OWCP"). OWCP is responsible for administering the Federal Employees Compensation Act ("FECA"), which provides replacement wages to federal employees who, like Rivera, are injured on the job and unable to work as a result. See 5 U.S.C. §§ 8102, 8145; 20 C.F.R. § 10.1.

Rivera's FECA claim was approved. In 2006, he began receiving regular payments. In order to confirm that he remained eligible for benefits from OWCP, he had to periodically file various forms, including CA-1032 forms. A CA-1032 form covers the 15 months prior to the date of the form's completion. As relevant here, Part A ("EMPLOYMENT") asks (1) "Did you work for any employer during the past 15 months?"; (2) "Were you self-employed or involved in any business enterprise in the past 15 months?"; and (3) "If you answered 'No' to both questions 1 and 2, state whether you were unemployed for all periods during the past 15 months." The accompanying Part A instructions require the report of "ALL employment for which you received a salary, wages, income, sales

commissions, piecework, or payment of any kind," as well as "ALL self-employment or involvement in business enterprises," including "providing services in exchange for money, goods, or other services." This section also requires reporting of "what you were paid," including the "value of such things as housing, meals, clothing, and reimbursed expenses."

Part B ("VOLUNTEER WORK") was worded slightly differently in different versions of the form. One version asks if the beneficiary "perform[ed] any volunteer work for which ANY FORM of monetary or in-kind compensation was received[.]" Another version asks if the beneficiary "perform[ed] any volunteer work including volunteer work for which ANY FORM of monetary or in-kind compensation was received[.]" Part D ("OTHER FEDERAL BENEFITS OR PAYMENTS") requires the listing of "any benefits received from the Social Security Administration (SSA) which you receive as part of an annuity under the Federal Employees' Retirement System (FERS)." An OWCP claims examiner explained at trial that all of this information was important because (1) evidence of capacity to perform work could lead to a reduction of OWCP benefits and (2) the receipt of other benefits could trigger an offset of OWCP benefits or those other benefits, so as to avoid overpayment (i.e., double-dipping).

Separately, Rivera filed a claim on March 20, 2007 for Social Security Disability Insurance ("SSDI") benefits. SSDI

benefits are paid to individuals who are unable to perform work and meet other eligibility requirements. Although Rivera had applied for SSDI benefits back in 2005, his claim was denied. An SSA-generated summary of Rivera's 2007 SSDI application[1] revealed the following: (1) he was unable to work because of his disabling condition (based on his May 25, 2005 injury), (2) he had filed or intended to file for workers' compensation, but was currently not receiving benefits, and (3) he understood that making a false statement of a material fact in his application was a criminal act. As part of his application, Rivera also submitted a work history form. As relevant here, Rivera listed his employment as a maintenance worker for USPS (from December 2003 until the time of his injury in May 2005), but did not mention any other work activities undertaken during that period.

On November 2, 2007, Rivera was notified that his SSDI claim was approved, and he began receiving disability benefits. The approval notification stated that "[t]he decisions we made on your claim are based on information you gave us" and "[i]f this information changes, it could affect your benefits." It referred to an accompanying pamphlet that provided more information on "what must be reported and how to report[,]" including on "what to do if

---

[1] Rivera appears to have applied for SSDI benefits orally; SSA "stored the application information electronically" and sent him a "summary of [his] statements" which we draw on here.

you go to work or if your health improves." The notification also informed Rivera that "[i]f you receive workers' compensation and/or public disability payments, we may have to reduce your Social Security benefits." It therefore instructed him to "[p]lease let us know as soon a decision is made on your claim for these payments."

In 2013, after Rivera had been receiving both OWCP and SSDI benefits for some years, the USPS Office of the Inspector General began an investigation into Rivera's receipt of OWCP payments. The investigation was triggered by reports that Rivera had been present at the local USPS headquarters and meeting with other employees there in connection with APWU activities. Rivera, as it happened, had long ties to the union, having served as its president from 2002 until 2004. He had also worked as a union steward, helping represent other employees, while he was employed as a flat sorter machine operator for USPS from 1995 until 2001. OIG was interested in whether Rivera was continuing to work for the union in some capacity without reporting that work to OWCP.

The OIG investigation produced evidence that, among other things:

(a) Rivera had repeatedly visited APWU and USPS headquarters in 2011-2013. At times, according to witness testimony, he appeared to be acting as a union official while doing so. An APWU security logbook also indicated that he

made many visits to APWU headquarters between February 2011 and August 2013.

(b) Rivera had performed work for the APWU. He signed a contract with the union to work as part of the Election Committee for the union's 2013 election. Moreover, Rivera had received payments from APWU in 2011-2013, including reimbursements for APWU-related travel and expenses. For example, he received $160 in wages and $68 in meals and mileage reimbursement relating to work for the APWU election committee between July 31 and August 9, 2013. He was also nominated for an OWCP-sponsored injury compensation training course in Florida, which he attended in August 2013. According to his nomination letter, this was because he "currently work[s] processing Injury Compensation cases[.]"

(c) Rivera had helped fellow employees with various labor-related issues. For example, he helped represent at least 56 postal employees in various Equal Employment Opportunity complaints filed between 2005 and 2012, assisted one employee with an injury compensation claim in 2011, and wrote to the Merit Systems Protection Board on behalf of another employee's claim in 2012.

According to the government, however, Rivera never reported on his OWCP forms that he worked for the union. Indeed, on August 8,

- 7 -

2013, just over a month after Rivera had filed his latest CA-1032 form, undercover OIG employees (posing as a Department of Labor contractor and a translator) met with Rivera. They asked him to complete another CA-1032 while they reviewed the instructions together. As a government investigator explained at trial, this arrangement was designed to make sure that Rivera understood the "importance of being truthful on those forms" and that there was "no doubt" in his mind about what his answers were. When the interviewer asked whether, in the past fifteen months, Rivera had performed any work for an employer, had been self-employed or involved in any business enterprise, or had performed any volunteer work, Rivera said "no" each time and indicated similarly on the form. Likewise, according to the government, Rivera never reported his work or any income to the SSA.

## B. Procedural History

Rivera was indicted on August 30, 2013 and eventually tried on the following five charges:

(a) three false statements counts (18 U.S.C. § 1001), corresponding to three allegedly fraudulent CA-1032s dated June 25, 2012, June 25, 2013, and August 8, 2013,

(b) a theft of government property count (18 U.S.C. §§ 641-642), alleging the theft of $6,209.70 in SSDI benefits between "on or about" July 22, 2013 and August 30, 2013, and

- 8 -

(c)   a failure to disclose count (42 U.S.C. § 408(a)(4)), relating to his failure to tell the SSA, between "on or about" July 22, 2013 and August 30, 2013, about his work activities, which allegedly resulted in the receipt of $7,808.80 in SSDI payments to which he was not entitled.

After a nearly two-week jury trial, Rivera was convicted on all five counts.  He was sentenced to three years of probation and ordered to pay restitution of $4,139.80 to SSA.

## II.

On appeal, Rivera makes four arguments.  First, he claims that there was insufficient evidence to support convictions on any of the five counts.  Second, he challenges the district court's grant of a government motion in limine prohibiting Rivera from presenting evidence that the "real fault" in the case lay with USPS, OWCP, or SSA "for failing to prevent the fraud."  Rivera maintains that this ruling unfairly prevented him from presenting significant exculpatory evidence.  Third, Rivera argues that the district court improperly calculated the relevant "loss amount" attributable to his offenses, which led in turn to an excessive offense level calculation under the Sentencing Guidelines. Finally, Rivera claims that there was insufficient support for the amount of restitution imposed.  We discuss each argument in turn.

## A. Sufficiency of the Evidence

### 1.    Standard of review

Rivera's sufficiency challenges were raised below in pre-verdict motions for judgments of acquittal.  When preserved, sufficiency challenges present questions of law and are reviewed de novo.  United States v. Ayala-Vazquez, 751 F.3d 1, 17 (1st Cir. 2014).  In conducting that review, we interpret the evidence in the light most favorable to the jury's verdict.  United States v. Peña-Santo, 809 F.3d 686, 696 (1st Cir. 2015).  We then ask whether, viewing the evidence in that light, any reasonable jury could have found that the government proved the essential elements of its case beyond a reasonable doubt.  Id.

But here, according to the government, a different standard applies.  The government says that, because Rivera did not file a post-verdict motion for acquittal, he waived his sufficiency claim. Waiver applies, the government maintains, even though Rivera moved for acquittal based on insufficient evidence after the close of the government's case -- and renewed that motion after the close of his own.

In support of this position, the government relies solely on a passing statement from United States v. Dudley, 804 F.3d 506 (1st Cir. 2015).  There, we noted that the defendant had waived his motion for judgment of acquittal by "fail[ing] to renew [it] at the close of the entire case (after offering evidence in

- 10 -

his defense) and following the guilty verdict." Id. at 519 (citing United States v. Maldonado-García, 446 F.3d 227, 230 (1st Cir. 2006)). The government suggests that, rather than just explaining why the claim was waived in that particular case, this line from Dudley establishes a rule: that both a pre- and post-verdict motion are needed to avoid waiver of a sufficiency challenge. But, as made clear by the very case relied upon by Dudley in making that statement, it is the "combine[d]" omission of a proper pre- and post-verdict motion for acquittal that constitutes waiver. Maldonado-García, 446 F.3d at 230; see also 2A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 469 (4th ed. 2021) ("When defendant files the appropriate motion under Rule 29 during or after trial, then the standard of review for a sufficiency of the evidence claim is de novo." (emphasis added)). In other words, as we have said, when a defendant makes a proper pre-verdict motion for acquittal on a particular count, the motion is "not waived," even if he "fail[s] to contest his conviction as to that count in his post-verdict motion." United States v. Pena, 586 F.3d 105, 111 n.5 (1st Cir. 2009).[2] In short, we reject the

---

[2] Reading Dudley as requiring both pre- and post-verdict motions for acquittal is unsustainable for a separate reason. Rule 29 itself provides that a defendant is "not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge." Fed. R. Crim. P. 29(c)(3); see also United States v. Castro-Lara, 970 F.2d 976, 980 (1st Cir. 1992) (confirming that "a defendant who files a time[ly] post-trial motion for acquittal

- 11 -

notion that a separate post-verdict motion under Rule 29(c) is required to avoid waiver even after the filing of a proper pre-verdict motion under Rule 29(a).

### 2. Analysis

#### (a) False statement charges

We first consider the three false statement charges under 18 U.S.C. § 1001. To sustain a § 1001 conviction, "the government must prove that the defendant (1) made a material, false statement (2) in a matter within the jurisdiction of the government (3) knowing that the statement was false." United States v. Vázquez-Soto, 939 F.3d 365, 371 (1st Cir. 2019). Rivera concedes (and conceded at trial) that he did not fill out the three CA-1032 forms correctly, but maintains that there was insufficient evidence that (1) he knew the statements were false or (2) that the false statements were material.

As to knowledge, Rivera argues that it was difficult to understand and fill out the CA-1032 forms, and thus any false statements were not knowingly false. He also points to his interview with the undercover OIG investigator, where he openly expressed an interest in working in some capacity. He also suggests that he was generally open and unapologetic about his ongoing work with the union. These statements and actions, Rivera

___

stands on the same footing as a defendant who moves for acquittal at the close of all the evidence").

- 12 -

maintains, are inconsistent with the theory that he knowingly filled out the forms incorrectly.

The jury, however, also heard testimony from a former APWU president that Rivera had extensive experience as a union official and assisted other members with OWCP issues. Indeed, he was nominated for a special OWCP training course specifically because he had experience processing injury compensation cases. Additionally, the CA-1032 forms and related documents repeatedly warned Rivera about the need to honestly disclose his work and volunteer activities. For example, the CA-1032 form spelled out, in all-caps, that "SEVERE PENALTIES MAY BE APPLIED FOR FAILURE TO REPORT ALL WORK ACTIVITIES THOROUGHLY AND COMPLETELY." A reasonable jury could infer, based on Rivera's extensive experience and these repeated warnings, that he knew he had to disclose his work and volunteer activities but chose not to. See Vázquez-Soto, 939 F.3d at 372 ("Evidence of a defendant's culpable state of mind may be 'gleaned from . . . circumstantial evidence presented at trial.'" (quoting United States v. Troisi, 849 F.3d 490, 494 (1st Cir. 2017))).

Rivera's strongest argument is that he did not specifically know that he had to disclose volunteer activities for which he was not paid. One version of the CA-1032 form -- the version completed by Rivera during the interview on August 8, 2013 -- is potentially somewhat confusing in this regard, as Part B

- 13 -

("VOLUNTEER WORK") asks if the beneficiary "perform[ed] any volunteer work for which ANY FORM of monetary or in-kind compensation was received[.]" Indeed, when the undercover OIG agents mentioned volunteering, Rivera sought clarification:

> MR. RIVERA:     That's if I'm getting paid for it; right?
>
> [AGENT 1]:      Yeah, or your volunteer activities, you report -- you know, maybe you belong to American Legion if you're a vet. I don't know if they have it here.
>
> MR. RIVERA:     Yeah.
>
> [AGENT 1]:      Yeah. Some people -- like say you're the treasurer or whatever, you would need to report that, because you do work --
>
> MR. RIVERA:     Okay.
>
> [AGENT 1]:      -- for them. So --
>
> [AGENT 2]:      Church groups and stuff.
>
> [AGENT 1]:      Church groups, social organizations, real employment, like maybe you have a contract in business, or you do child care, whatever.

Rivera argues that this muddled exchange -- particularly the agent's initial reply to Rivera's direct question about payment -- reasonably suggests that Rivera thought he only had to report paid volunteer activities.

However, for two of the counts -- Counts 1 and 3 -- this argument is of no help, since Rivera had actually been paid some wages for APWU work during the relevant time period (i.e., fifteen months prior to the completion of each respective form). As for

- 14 -

Count 2, there appears to be no evidence that he was paid wages during the relevant period, but the evidence does show that Rivera was reimbursed for at least one official union-related expense[3] and regularly logged into the APWU headquarters log-book during that time. From this evidence, a reasonable jury could conclude -- as the district court did in denying the motion for judgment of acquittal on Count 2 -- that the evidence of official reimbursement showed that Rivera was performing at least some kind of work for the union during the relevant period. And, crucially, the language of the specific form pertaining to Count 2 did not include the arguably confusing language about paid volunteer work. That is, it did not limit its definition of volunteer work to "volunteer work" for which some kind of compensation was received; rather, it asked whether Rivera "perform[ed] any volunteer work including volunteer work for which ANY FORM of monetary or in-kind compensation was received" (first emphasis added). Therefore, regardless of the lack of evidence of paid wages, a reasonable jury could infer that Rivera was performing volunteer work during the relevant period, was required to report that activity, and knowingly failed to do so.

---

[3] Specifically, Rivera was reimbursed for paying the $50 hospital deductible for a union member whom he took to the emergency room after she had a health incident at work.

As to materiality, Rivera's argument is brief and underdeveloped. He suggests, without elaboration, that the government failed to show exactly how Rivera's benefits would be impacted by the false statements. But an OWCP claims examiner explained at trial that reporting work and volunteer activity is important because evidence of capacity to perform work triggers further review of a claim and could lead to a reduction of OWCP benefits. This showing is sufficient. To establish materiality, a statement "merely ha[s] to be of a type which would have a 'natural tendency' to influence an investigation in the 'abstract.'" United States v. Chen, 998 F.3d 1, 10 (1st Cir. 2021) (quoting United States v. Phillipos, 849 F.3d 464, 473 (1st Cir. 2017)).

**(b) Remaining counts**

As mentioned, the final two counts both relate to Rivera's receipt of Social Security benefits. Under 18 U.S.C. § 641, it is a crime to "embezzle[], steal[], purloin[], or knowingly convert[] . . . money, or [a] thing of value of the United States or of any department or agency." To win a conviction on this count, the government had to produce evidence "sufficient to allow a rational factfinder to conclude beyond a reasonable doubt that [the defendant] had specific intent to 'steal . . . a thing of value' from the United States." United States v. Donato-Morales, 382 F.3d 42, 47 (1st Cir. 2004) (quoting 18 U.S.C. § 641).

- 16 -

Under 42 U.S.C. § 408(a)(4), it is a crime for anyone (1) with knowledge of an event affecting his or her initial or continued right to an SSA payment (2) to conceal or fail to disclose that event to the SSA (3) with an intent to secure payment fraudulently (i.e., in an amount greater than was due to him or her or when no payment was authorized). See United States v. Phythian, 529 F.3d 807, 812 (8th Cir. 2008).

Rivera challenges the intent element as to both counts, claiming that there was no demonstrable intent on his part to conceal his action or steal from or defraud SSA. But the government introduced evidence that, when Rivera previously applied for SSDI benefits (in 2005), he had listed his work as a union steward, which he undertook as part of his USPS maintenance job duties from 1995-2001. That 2005 claim was rejected, on the grounds that he was able to perform at least one prior job. When Rivera applied again in 2007, he omitted that information. A reasonable jury could conclude that Rivera "learned his lesson" and knowingly omitted that information in order to qualify the second time around. Additionally, Rivera received pamphlets and instructions making clear that he needed to report jobs or work activity to SSA. A reasonable jury could likewise conclude that Rivera was aware of his obligations but chose not to notify SSA in order to protect his eligibility. Rivera makes no argument as to why these inferences are unreasonable.

- 17 -

**B. Motion in Limine**

We next consider whether the court properly granted the government's motion prohibiting Rivera from presenting evidence that the "real fault" in the case lay with USPS, OWCP, or SSA "for failing to prevent the fraud." We review a district court's decision to admit or exclude evidence for abuse of discretion. See Torres-Arroyo v. Rullán, 436 F.3d 1, 7 (1st Cir. 2006). Under that standard, we will overturn a particular ruling "only if it plainly appears that the court committed an error of law or a clear mistake of judgment." Id.

In this case, the district court repeatedly justified its exclusionary ruling based on a concern that Rivera, in drawing attention to the lack of action by the relevant agencies, might be suggesting a kind of "blame-shifting" defense that would confuse jurors. In considering the propriety of that ruling, we accept Rivera's argument that the fact that "USPS, the DOL, OWCP, and SSA knew that Mr. Rivera was performing duties as a Union representative" could be relevant, insofar as their knowledge could suggest that he lacked the requisitely culpable state of mind. That is, his openness (and the corresponding lack of action by the relevant agencies, despite their knowledge) might have confirmed in his mind that "all was well" -- i.e., that he was disclosing all that he needed to disclose and that he was not required to report any of his union activities to either OWCP or

SSA. "Relevancy, however, is a condition precedent to admissibility, not an ironclad guarantee of admissibility." Torres-Arroyo, 436 F.3d at 7. The Federal Rules of Evidence allow a district court to exclude even relevant evidence if its "probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury." Fed. R. Evid. 403; see also United States v. Schneider, 111 F.3d 197, 202 (1st Cir. 1997) (finding "evidence [of intent that] may have been relevant but only to a limited degree" was properly excluded when "it had a substantial capacity to mislead the jury").

Here, the district court's overall concern of juror confusion was reasonable. After all, whether or not particular employees at the agencies were negligent or less-than-diligent in reporting Rivera's work activities to anyone was not directly at issue in this case. Particular employees may not have been familiar with Rivera's status, scope of activities, or reporting obligations. Indeed, they may have simply assumed that he was actually reporting his activities as required.

With these general considerations in mind, we turn to the questions that were ultimately precluded by the in limine order. In making his argument here, Rivera has identified only one specific line of witness questioning that he claims was improperly barred. Namely, Rivera argues that he was prevented at trial from asking Juan Delgado, a USPS human resources manager,

whether Delgado should have notified DOL that Rivera was volunteering. Rivera was also prevented from eliciting from Delgado whether Rivera had asked him for a job. While Delgado's failure to report Rivera's activities and Rivera's request to Delgado for a job may have been slightly probative as to Rivera's state of mind, both questions also raised some risk of juror confusion, as they again arguably suggest that Delgado either had some duty to report Rivera's request to the proper authorities or that Rivera had somehow absolved himself by indicating his willingness and ability to work to someone at USPS. Given that there was ample other evidence of Rivera's openness about his activities (e.g., that Rivera had been seen accompanying union officials at USPS headquarters and, as the district court noted, that Rivera met with various other USPS officials), additional evidence of Rivera's openness with Delgado had limited probative value. See United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000) (noting that "[t]he probative value of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point" (quoting 22 Charles A. Wright & Kenneth A. Graham, Jr., Federal Practice and Procedure § 5250 (1978))). The district court therefore was "well within the ambit of [its] discretion" in concluding that the probative value of these questions was substantially outweighed by the danger of misleading the jury. Torres-Arroyo, 436 F.3d at 7.

## C. Loss Calculation

We turn next to Rivera's argument against the loss calculation the district court performed under the Sentencing Guidelines. In doing so, "[w]e review the district court's interpretation and application of the sentencing guidelines de novo and factual findings for clear error." United States v. Tavares, 705 F.3d 4, 24 (1st Cir. 2013) (quoting United States v. Cortés-Cabán, 691 F.3d 1, 26 (1st Cir. 2012)).

We begin with some background. For crimes involving larceny, embezzlement, or other forms of theft, the Sentencing Guidelines recommend different offense levels based on the monetary loss associated with the offense. See U.S. Sent'g Guidelines Manual ("U.S.S.G.") § 2B1.1(b) (U.S. Sent'g Comm'n 2018). In this context, "loss" can include both "actual" and "intended" loss. Id. § 2B1.1 cmt. 3(A). In this case, the district court accepted that Rivera intended a loss of $899,328.38 -- the total amount of OWCP and SSA benefits paid to Rivera since his initial applications. That conclusion, in turn, led the court to apply a 14-point enhancement to Rivera's total offense level. Rivera claims that this intended loss amount (and corresponding enhancement) was far too high.

We first confront one argument raised by the government. It suggests that, even if the district court made a mistake in the loss calculation, any mistake was harmless, since the district

court departed downward from the guidelines recommendation and imposed only a probationary sentence. But our precedents do not permit us to assume harmlessness in this fashion. There is still a reasonable possibility that the high guidelines range calculated by the district court had an anchoring effect and influenced its assessment of the appropriate punishment. See United States v. Alphas, 785 F.3d 775, 780 (1st Cir. 2015) ("Although the court below imposed a sentence beneath the bottom of the GSR [guideline sentencing range], there is at least a possibility that the court would have imposed an even more lenient sentence had it started with a lower GSR."). Unlike United States v. Arif, 897 F.3d 1 (1st Cir. 2018), upon which the government relies, here there was no statement by the district court to the effect that "regardless of the Guidelines calculation," he or she would have "reach[ed] the same result" as to the appropriate sentence. Id. at 12 (alteration in original) (second internal quotation marks and citation omitted).

Proceeding to the merits of the loss calculation itself, we find no error. The Sentencing Guidelines explain that, in cases of government benefits fraud, loss "shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses." U.S.S.G. § 2B1.1 cmt. 3(F)(ii). In other words, a district court should try to parse out which benefits were legitimately paid and which were not, and

base the loss amount on only the latter. Id. ("For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50."); see also Alphas, 785 F.3d at 783 ("The best way to gauge the seriousness of a fraud offense is to determine how much the fraudster set out to swindle -- and no fraudster sets out to swindle sums that he would have been paid anyway.").

In Alphas, however, we recognized in our discussion of intended loss that -- at least where "a defendant's claims [are] demonstrably rife with fraud" -- "a sentencing court may use the face value of the claims as a starting point in computing loss." 785 F.3d at 784. The burden of production then shifts to the defendant, "who must offer evidence to show (if possible) what amounts represent legitimate claims." Id. And then, finally, "the sentencing court must determine the amount of loss that the government (which retains the burden of proof) is able to establish." Id. At the end of the day, the court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. 3(C). Indeed, "[d]epending on the defendant's offer of proof, the court might well conclude that the amount of loss is equal to the face value of the submitted claims." Alphas, 785 F.3d at 784.

Here, the district court used the face value of Rivera's total benefits as a starting point for the loss calculation, which

the government had substantiated by introducing OWCP payment history reports and Social Security beneficiary lists. As the district court reasoned, using the face value of the claims was appropriate given that, "ab initio," Rivera "had an obligation to report . . . and because he didn't . . . everything is basically an illegal amount he's receiving since that outset." The court continued: "[H]ad he reported . . . [his benefits] could have been recalculated, but because he didn't he's getting the benefit of everything. And his intent is to get that entire benefit and you just can't separate that."

Given the court's reasonable acceptance of the face value of the benefits as the initial basis for the loss calculation, it then fell to Rivera to establish which portion of those amounts "represent[ed] legitimate claims." Alphas, 785 F.3d at 784. On appeal, however, Rivera does not point to any evidence delineating what portion of the benefits were legitimate, or even how he could establish such a figure. Rather, he argues that it remained the government's burden to show the amount of fraudulent, as opposed to legitimate, claims. But that contention is inconsistent with the framework outlined in Alphas. In light of Rivera's failure to meet his evidentiary burden, we conclude that the court reasonably concluded that the amount of loss was equal to the face value of the claims.

Rivera also briefly suggests that the loss calculation was excessive because it included losses incurred outside of the timeframe set forth in the indictment. But "[i]n calculating loss amounts under the Guidelines, a district court evaluates losses stemming from the conduct of conviction and any relevant conduct." United States v. Curran, 525 F.3d 74, 78 (1st Cir. 2008) (emphasis added). In cases like this one, "relevant conduct" includes conduct that was "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).[4] And, significantly, "[r]elevant conduct may include both acquitted and uncharged conduct." United States v. Cox, 851 F.3d 113, 121 (1st Cir. 2017). Against this background, Rivera does not adequately explain why his earlier claims should not be considered relevant conduct. See United States v. Bennett, 37 F.3d 687, 694 (1st Cir. 1994) (concluding district court erred in refusing to consider amounts of uncharged fraudulent loans in its loss calculation when they constituted relevant conduct).

## D. Restitution Amount

Finally, we consider Rivera's challenge to the amount of restitution imposed. Restitution orders imposed under the

---

[4] This definition of relevant conduct governs because it applies to crimes that are "grouped" under U.S.S.G. § 3D1.2(d). Here, Rivera's five offenses -- all involving theft and fraud -- were grouped under that provision because the overall offense level was determined on "the basis of the total amount of harm or loss." U.S.S.G. § 3D1.2(d).

Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, are generally reviewed only for an abuse of discretion, with their underlying factual findings reviewed for clear error. See United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996). "[W]e consider only whether the restitution award has 'a rational basis in the record.'" United States v. González-Calderón, 920 F.3d 83, 85 (1st Cir. 2019) (quoting United States v. Salas-Fernández, 620 F.3d 45, 48 (1st Cir. 2010)).

Here, the government initially requested $899,328.38 in restitution -- the same amount as the intended loss amount discussed above, which in turn corresponded to the full amount of SSA and OWCP benefits paid to Rivera. The district court, however, decided that it could only impose restitution for the conduct covered by the offenses of conviction. Hence, for the CA-1032 false statement charges, the court ruled that the government could only recover for the losses caused between March 25, 2011, and August 8, 2013, corresponding to the period of 15 months prior to the execution of the false CA-1032 forms. Similarly, for the SSA-related charges, the court determined that the government could only recover for the losses caused between July 22, 2013 and August 30, 2013, the time period spelled out in the indictment for those charges.

- 26 -

The government attempted to comply with the court's ruling, representing that \$144,588.90[5] in OWCP benefits and \$4,139.80 in SSA benefits were paid during the relevant time periods. But the district court then determined that the government could not, as in the Guidelines loss-calculation context, merely rely on the face value of the benefits paid. Instead, the district court correctly noted that, in the restitution context, the government had to demonstrate actual losses. See United States v. Innarelli, 524 F.3d 286, 290 & n.4 (1st Cir. 2008) (explaining that intended loss can be used "for purposes of determining a defendant's sentence" under the Guidelines, but "for purposes of determining the restitution portion of a defendant's punishment, only actual loss may be taken into account"). The district court found the government had met this standard as to the SSA benefits, but not as to the OWCP benefits. It therefore ordered Rivera to pay only the \$4,139.80 in restitution to SSA.

---

[5] Even though the district court had explicitly limited OWCP restitution to benefits paid between March 25, 2011 and August 8, 2013, the government included amounts paid from March 25, 2011 until August 8, 2014 in its calculation of \$144,588.90. The court referred to this figure without noting any incongruity. Since, as we explain below, the court ultimately ruled that restitution was limited to actual losses, which the government failed to establish as to all OWCP benefits, the discrepancy ultimately makes no difference. For the record, though, the government later stated the actual amount of OWCP benefits paid between March 25, 2011 and August 8, 2013 was \$140,684.90.

Given the posture of the case, our responsibility is only to review the appropriateness of the final restitution amount ordered. In challenging that amount of restitution, Rivera again argues that the district court failed to determine whether some of those payments were legitimate. Under the MVRA, there is a causation standard: "restitution should not be ordered if the loss would have occurred regardless of the defendant's misconduct underlying the offense of conviction." United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002); see also Alphas, 785 F.3d at 786 (requiring "a but-for connection between the defendant's fraud and the victim's loss"). Thus, as Rivera suggests, if the SSA would have paid Rivera some amount of SSDI benefits absent his concealment, those funds should not be included in the restitution order. In essence, they would not be attributable to Rivera's false statements.

Here, however, there was some evidence that, absent Rivera's concealment, he would have received no benefits at all. As discussed above, Rivera originally included his work as a union steward in his 2005 application for SSA benefits. That application was denied. When he applied in 2007, he omitted that work, and his application was approved. This sequence suggests that his concealment of his union activities was the decisive factor in whether he received SSDI benefits at all. As a result, the district court could conclude that the total amount of SSDI

benefits paid during the relevant period amounted to SSA's actual loss.  Said differently, Rivera's SSA application history represents "a modicum of reliable evidence" that the district court could rely on in determining the appropriate amount of restitution. González-Calderón, 920 F.3d at 85 (quoting United States v. Naphaeng, 906 F.3d 173, 179 (1st Cir. 2018)).

Affirmed.